[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action to recover damages for the wrongful death of the named plaintiff's decedent was assigned to the undersigned, state trial referee, following the decision in Canning v. Lensink,221 Conn. 346 (1992). Albeit a nonjury case, the parties stipulated to proceed to trial and judgment pursuant to 52-434 Connecticut General Statutes on October 19, 1992.
Plaintiff's amended complaint was filed on July 15, 1992. In his answer to the amended complaint defendant admitted the following undisputed facts.
The defendant Brian R. Lensink, by virtue of the authority set forth in Connecticut General Statutes 19a-24, is the duly appointed Commissioner of Mental Retardation whose duties and responsibilities, as set forth in Connecticut General Statutes19a-469, cover care and treatment of patients at facilities under jurisdiction of the Connecticut Department of Mental Retardation.
At all times mentioned herein California House, Department of Mental Retardation, Region 5-New Haven Center (hereinafter called California House) was a residential facility whose function and purpose was to provide for the safe lodging, care and treatment of mentally retarded persons and/or other certain individuals within its region.
On or about January 13, 1988, John F. Canning, father of the decedent Shaun Canning, was duly appointed as Administrator of CT Page 1414 the Estate of Shaun Canning by the Probate Court for the District of Hamden.
On or about Friday, March 6, 1987, the decedent, Shaun Canning, a retarded individual, was admitted to the California House for the purpose of respite care.
At the time of said admission, the admission information sheet indicated Shaun Canning's general health was good. Further medical information noted on said admission information sheet listed a treatment plan wherein a physician should be notified if Shaun Canning's fluid intake decreased in light of a known medical problem concerning fluid salt imbalance.
On or about Wednesday, March 11, 1987, Shaun refused to get out of bed and for the first time during his respite care did not go to the rehabilitation program at the New Haven Center Regional Rehabilitation Building between 3:30 a.m. and 2:00 p. m. as was his normal activity between Monday and Friday of each week.
On or about Thursday, March 12, 1987 Shaun Canning remained in bed all day.
On or about Friday, March 13, 1987 Shaun Canning remained in bed all day with an elevated temperature.
On or about Saturday, March 14, 1987 at a time between approximately 4:00 a.m. and 5:00 a.m., a staff member of the California House found Shaun Canning gasping for breath and cyanotic in color.
On or about Saturday, March 14, 1987, in the early morning, Shaun Canning was transported by ambulance to the Emergency Room of the Hospital of St. Raphael whereupon Shaun Canning was pronounced dead approximately 45 minutes after arrival, at 6:51 a.m.
The amended complaint cites 19a-24 Connecticut General Statutes and 19a-469 and 17-206(c) as statutory mandates imposing duties and responsibilities on defendant to cover care and treatment of patients at facilities under defendant's jurisdiction.
Former 19a-469 defines the rights of persons under defendant's supervision and direction (in part) as follows: CT Page 1415
 "(a) No person placed or treated under the direction of (defendant) in any public or private facility shall be deprived of any personal property or civil rights . . . .
 "(b) Each person placed or treated under the direction of (defendant) in any public or private facility shall he protected from harm and receive humane and dignified treatment which is adequate for his needs and for his development to his full potential."
 "(c) (defendant) shall adopt regulations with regard to the following . . . . (2) when and by whom therapies may be used; (3) which therapies may be used . . . ."
"(d) . . ."
 "(e) (defendant) shall ensure that each person placed or treated under his direction in any public or private facility is afforded the following rights and privileges: (1) the right to prompt, sufficient and appropriate medical and dental treatment."
Former 17-206(c) requiring humane and dignified treatment mandates in part:
 "Every patient treated in any facility for treatment of the mentally disorder shall receive humane and dignified treatment at all times, with full respect for his personal dignity and right to privacy. Each patient shall be treated in accordance with a specialized treatment plan suited to CT Page 1416 his disorder."
There can be no question that the decedent fell within the definition of "mental disorder". (Section 17a-540 Connecticut General Statutes). The evidence is clear that his deficits or impairments in adaptive functioning i.e. his effectiveness in meeting the standards expected for his age by his cultural group in areas such as social skills and responsibility, communications, daily living skills, personal independence and self-sufficiency were manifest in his preschool and primary school years. (Diagnostic and statistical manual of mental disorders: DSM-3rd cd. rev. American Psychiatric Press 1987).
In the definition of "mentally disordered" our statutes incorporates the definition in the most recent editions of the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders".
His medical history previous to his birth reveals a normal delivery. His postnatal history indicates that he had meningitis three weeks after birth that caused his retardation.
It is noted that defendant admitted in his pleadings that Shaun was known to be retarded and admitted to California House or the purpose of respite care. This admission entitles this court to take under consideration the mandate 17-206a(c) as it applies to 17-206c that "every patient shall receive humane and dignified treatment at all times."
It is noted that it is doubtful that the allegations of paragraph 13 of the amended complaint can reasonably be construed to allege any acts of negligence by defendant in his individual capacity rather than in his official capacity as the head of the department of mental retardation. Canning v. Lensink, 221 Conn. 346,352 (1992).
Plaintiff claims that the death of Shaun Canning was the direct and proximate result of the negligence of the defendant Commissioner of Mental Retardation, his agents, staff and employees in one or more of the ways alleged in paragraph 13 of the Amended Complaint and/or its subparagraph. In order to recover any damages plaintiff must prove negligence in any one, or more, or all, of the ways he alleged in paragraphs 13a through 13j. CT Page 1417
Plaintiff claims that defendant's negligence resulted from a departure (by his agents, staff and employees) from the accepted standard of care in like conditions for the providing of proper care for the decedent as set forth hereinafter (b through j).
 "b. they failed to adequately provide for the proper health care of Shaun Canning, a mentally retarded person, as mandated by the Connecticut General Statutes 19a-469 and 517-206(c)."
 "c. no physician saw nor attended Shaun Canning throughout his respite stay at the California House from his admission to that facility until the time of is [sic] death."
 "d. there were no fluid watches or weight watches arranged for Shaun Canning despite the information on the admission information sheet."
 "e. there were no tests done when Shaun Canning refused to attend his daily obligation at the New Maven Center Regional Rehabilitation Building."
 "f. prescription medication was given to Shaun Canning without a physician examination or order."
 "g. there was no intervention when Shaun Canning repeatedly refused to have his temperature taken."
 "h. staffing was inadequate with regard to the third shift at California House."
 "i. the decedent was not properly monitored during the night before his death even though the decedent CT Page 1418 was known to be ill."
 "j. they failed to adhere to Shaun Canning's health plan as prescribed upon admission."
As noted above, defendant admitted that the decedent expired on March 14, 1987. The official "Certificate of Death" dated and signed by Jon S. Marrow, M.D. failed to record the immediate cause of death, noting only "Pending further study" (Exhibit FF). The Hospital "report of death" i.e. report from Hospital of St. Raphael to office of the Chief Medical Examiner reports the signs and symptoms on admission as "Cardiac Arrest." The autopsy report signed by Jon S. Morrow, M.D. states in summary —
 "He allegedly experienced a one day history of fevers after which he was found in respiratory arrest, at autopsy, evidence of lobar pneumonia involving the right lower lobe was identified. This finding would account for his respirator decompensation and fever. Toxicologic studies are pending." (these toxicologic studies produced negative or unmarkable results). (Exhibit GG).
Plaintiff presented Jon S. Marrow, M.D., Chief of Pathology at Yale Medical Center, Chief of Pathology at Yale New Haven Hospital, Chairman of Pathology at the Yale Medical School and the Assistant Medical Examiner for New Haven County as a witness. Dr. Marrow launched an investigation of Shaun's death because it was sudden and unexpected. He performed an autopsy and filed a report of same. He produced his curriculum vitae. His excellent, educational, academic, professions and certification as a pathologist, qualifications were not attached or impeached. He performed an autopsy on Shaun's remains which in a comprehensive postmortem examination in which all of the organs of the body are removed and examined, both in-situ and individually. The body cavities were examined for evidence or abnormality. The tissues are examined at autopsy in some cases, by chemical analysis, in most cases by microscopic as well as cross examination. Its from these determinations that evidence, anatomic evidence of disease is sought . . . . Dr. Morrow's CT Page 1419 conclusion, based on the autopsy findings was that Shaun died from developing acute hemorrhogic lobar pneumonia involving the right lower lobe or the lower lobe of the right lung, and that was the primary cause. There was no toxicological evidence of toxic substance sort of things involved in this. Pneumonia is an infection of the lung. Lobar pneumonia really refers to a pattern of infection involving one discrete segment of the lung. This type is most commonly caused by a bacteria of a type called pneumococus. It used to be a very common cause of pneumonia, but in the antibiotic era its incidences has dropped. This is an imminently treatable disease with current modern antibiotic therapy. Dr. Morrow classified the lobar pneumonia which he observed on autopsy, as "moderate, moderate developing early." Dr. Marrow's opinion, based on the assumption that the lobar pneumonia diagnosis was of pneuma-coccal origin, was that with adequate hydration and institution of antibiotics therapy Shaun "probably would have responded within 24 hours with a dramatic improvement in the condition" and that "it's reasonably probable that he would have survived." Mr. Morrow concluded that Shaun's organs at autopsy were completely normal except for (1) acute change in the lung consistent with his pneumonia, (2) some, what are really short term and transient changes in the liver, which was something called fatty changes of really no clinical significance here, and atrophy and some changes in the brain reflective of his apparent history of infection.
Nothing found at autopsy, assuming the pneumonia was cured would indicate other than a normal longevity for Shaun. The opinion by Dr. Morrow was "reasonably probable" qualified by his retardation factor and its unknown and speculative nature.
Dr. William E. Lattanzi was deposed on behalf of the defendant on September 9, 1992. Dr. Lattanzi passed away before trial and the deposition is in evidence as plaintiff's exhibit HH. Plaintiff's exhibit II is a six page curriculum vitae for Dr. Lattanzi. He graduated from Yale Medical School and completed his internship and residency at Yale New Haven Hospital. He has chaired the Department of Pediatrics at the Hospital of St. Raphael and served as Clinical Professor of Pediatrics at the Yale Medical Center since early in the 1970's until his recent demise. He has lectured extensively on "Fluid and Electrolytes", "Fluid Therapy", "Problems of Fluid Management", "Oral Dehydration", and "Fluid Therapy in Children-Oral Fluid Therapy". Dr. Lattanzi had and produced at deposition out his notes, exhibits, and documents he reviewed CT Page 1420 prior to deposition and on which he predicated his opinion. These documents included laboratory work done in August of 1986 about the time Shaun was a patient at Yale New Haven Hospital, a "write-up" by Dr. Wessell/LaCamera of hospital values in 1986. (8/11/86 to 2/18/88 is covered). It was found in August of 1986 that Shaun had a very high sodium and was hospitalized. Dr. Lattanzi reviewed the Respite Management Plan at the Regional Center covering Shaun's arrival on Friday, March 6, 1987. Shaun's file contained a review of his activity and behavior, his likes and dislikes, notes of the California House staff indicating no showers, only baths, toilet before bed. Dr. Lattanzi reviewed the New Haven Regional Center File on Shaun, the depositions of Dr. Alan Meyers, Nurses Debbie Flynn, Sharon McLean, a compilation of the policies of the Regional Center, a record of the hospitalization of Shaun at New Haven Hospital from 8/6/86 to 8/14/86, Hospital of St. Raphael record indicating Shaun was brought in cardiorespiratory arrest on 3/14/87, the autopsy report, the chronology of his respite care and people involved with Shaun's care at the Regional Center. Dr. Lattanzi did not have records of five prior visits of Shaun to New Haven Hospital in June of 75, August of 76, 2 visits in August of 79, and the fifth in July of 81.
It was Dr. Lattanzi's professional opinion that "the probability is that Shaun died as a consequence of dehydration, hypernatremia." "And that the finding of the autopsy of three-centimeters consolidation left lower lobe was not the primary cause of his death."
Dr. Lattanzi considered all of the above mentioned information about Shaun and his respite care starting on Friday, March 6, 1987 and noted as significant that Shaun was aggressive, self-abusive to himself and abusive to staff, refused shower and bath and had dried blood in mouth. He did not report to work on Monday as he usually did. He was again self-abusive and the staff were concerned about it. He did not work Tuesday. Clothes were observed to be loose. Check log. Log nothing written. The staff did not record his weight. He received medication for his ears and a Ritalin dosage. The nurse called Dr. LaCamera. He did not eat breakfast on Wednesday or report for work. His general behavior different from the usual. He ate dinner. He wet bed two times. Soiled self. He spent Thursday in bed all day. Next day at 10:10 a.m. he had a temperature of 102.5. He was given Amoxicillin. The evidence fails to reveal the source of this prescription order. The record reveals that on 3/12/87 CT Page 1421 he was not taking fluids well. Rubbing ears. Slight odorous drainage from ear. There was no mention or reference to his prior history of having essentially hypernatremia or having episodes of hypernatremia. His record did note "salt/fluid imbalance occurs in summer time. Notify M.D. if fluid intake decreases." Dr. Lattanzi noted that defendant's policy states that the care manager must assure that the admission information is current and preforwarded to the respite coordinator. The Regional Center records did not contain his history of hospitalization at Yale six months before death for hypernatremia. He had been in respite care overnight before 1987. "Repeated hypernatremia" was in the Yale New Haven Hospital records but "wasn't in a record of the New Haven Regional Center."
 "hypernatremia simply states that concentration of sodium in the blood is too high . . . associated with dehydration."
"That was diagnosed in "86"." It was not written in records of the Regional Center. Dr. Lattanzi expressed an opinion "the respite center ought to give the same level of care that a parent would give to this boy whose behavior changed completely while in respite care." He noted "the concern of the staff of the work facility when he failed to show up for work as was his usual care and, his tremendous behavior change that the staff couldn't handle." He was observed wrapped in blankets naked. This information was conveyed to Dr. Wassell and he asked to "bring him in." They, "the staff" said "No." Dr. Lattanzi also noted references to "his pants falling off him." "Just getting thinner and thinner." "They didn't know about the hypernatremia" . . . "he had fluid and electrolyte imbalance in the past" . . . "seemed to be forgotten, or ignored," . . . "he had a fever (102.5) that "was never followed up because they couldn't take his temperature" "in a respite facility with nurses and other personnel", "if they had to restrain him, "they could have taken it under his armpit" "there are many ways to take temperatures", "this went on without very much intake", "should have known that he had fluid and electrolyte problem in the past", "his hyper irritability resulted from his dehydration which was unrecognizing and despite the fact they even had fluid and electrolyte imbalance on the sheet", "weight loss," "175 or so to 140 estimated" . . . "pneumonia itself, this one and a half inch consolidation in that lower lobe would be very unlikely to be the primary cause of death, coupled CT Page 1422 with the fact that his prior history showed that he had essentially hypernatremia", "he was dehydrated which caused his body to shut down basically, causing him to be lethargic and hyperirritable, all signs consistent with dehydration plus his past history resulting in his death."
Based on these facts "they (the staff at California House) should have felt something was really wrong with this boy."
To sum up it was Dr. Lattanzi's opinion with reasonable medical certainty that Shaun died of dehydration hypernatremia.
Dr. Lattanzi said that the medical personnel at the Regional Center did not fulfill these obligations in a medical . . . from a medical-care standpoint in this, which is tantamount to saying that they breached the standard of care to which they should be held responsible. That standard of care "is to follow a patient, their symptomatology. Write notes that can be used to follow the patient. To call other medical care, and to get the patient to a facility where that medical care can be delivered" . . . "and to know when it is warranted". "Another temperature should have been taken when his 10 a.m. temperature was 102.5 on March 13, 1987, in view of his continued behavior which was not normal. He was checked again at 9 p. m. . . . another temperature should have been taken, and when he was not doing any better, he was getting worse and worse. Through that time he should have been to a doctor." Dr. Lattanzi stated after reviewing the nurse's notes of the 9 p. m. checking of Shaun on 3/13/87, that the "care and treatment of Shaun was inappropriate, and breached the standard of care properly to assess any health medical issue which would warrant continued nursing observation during the night." He further stated that "nurses and the team were equally responsible through the week for care and treatment of Shaun that was inappropriate", and "breached this standard of care."
It was his conclusion that in view of the 102.5 fever at 10 a.m. another temperature should have been secured and if it warranted communicated to Shaun's doctor and that a proper assessment of his records and respite chart or notes warranted continued nursing observation during the night. He further noted that:
 "None of this seemed to register that this was an acutely ill kid and it was fairly nonchalant for CT Page 1423 somebody . . . for treatment for somebody who was not progressing in an upward motion, but spiraling downwards."
This nonchalant lack of proper assessment for treatment of Shaun violated the mandate of 17-206c in that he was denied humane and dignified treatment at all times. A review of the exhibits in evidence together with testimony and opinions of Drs. Lattanzi, LaCamera, Meyers and Grovesbeck, and Nurses Mackintosh, McLean and Flynn support the conclusion of Dr. Lattanzi that:
"This boy died unnecessarily."
What should have been a team controlled treatment of professional care and supervisions was a failure and the team ignored his significant and persistent crying for help.
The opinion on record from Dr. Morrow and Dr. Lattanzi as to the cause of Shaun's death are compatible.
 "He did have pneumonia, and that we know for certain." "There was nothing at autopsy that would rule out dehydration."
Both pneumonia and dehydration could be treated by "prompt, sufficient and appropriate medical treatment." Connecticut General Statutes 172-238(e). Pneumonia therapy by way of antibiotics. Dehydration therapy by way of fluids, by mouth or intravenous.
Shaun's aunt, his brother and his primary physician Dr. Robert LaCamera all testified about these observations of Shaun and their personal experiences with Shaun. His daily activities, schooling, trips to Ireland and England, visits, social activities and generally good health. Dr. LaCamera examined him yearly over a period of twelve years. He grew up pleasantly and developed communication skills in spite of his limitation of intellect. He enjoyed a good quality of life. His general health was quite good. Dr. LaCamera expected him to live as long as an average American male and to continue to enjoy a good quality of life.
Both parents described Shaun as a happy child who enjoyed to CT Page 1424 hug and be hugged. He had his own room, furniture and clothes. He enjoyed social company, visits, going shopping, family outings, picnics, school, training sessions at ACES and working at the New Haven Regional Center. He enjoyed being with people, his routine at home and his trips with his family to visit relatives. He enjoyed TV, especially wrestling, and enjoyed visits to McDonalds. Both parents cooperated with the staff in answering questions regarding his history and medical needs. Both specifically remember stressing his need for fluids and the need to alert his primary care physician if his fluid intake decreased. He had manifested symptoms of irritability, loss of weight and fever or temperature on two prior occasions resulting in hospitalization for dehydration. He recovered on each occasion after proper therapy. Evidence on the awareness of the California House staff regarding these facts and symptoms was vague. Certainly Mr. LaCamera should have been made aware of his condition and all of the pyramiding symptoms and facts of record before he was sent to the Hospital of St. Raphael and pronounced dead on March 14, 1987. Testimony from Jane Six and Elizabeth Olds both employees at the Regional Center describes these observations of Shaun from Monday through Friday and the participation of Doug Fernald and Bob Casey also employees who also saw Shaun that week. As a result of information received by Ms. Olds concerning the observations of Ms. Six, Doug Fernald and Bob Casey, all line staff people in the workshop at the Regional Center, she (Ms. Olds) told her immediate supervisor about "concerns about Shaun, about what was going on at the unit and the difficulties that he was having, about the fact that my staff had been held over and residential staff had been released, which was against what we normally would have done." "So I talked to him about that concern." He told me to "mind my own business and to direct my staff to mind their own business". "I talked to him daily about the situation . . . he told me to mind my own business and to stay out or it. That it wasn't a day service issue." Based on seventeen years experience in vocational rehabilitation and training of mentally handicapped people Ms. Olds thought "he was neglected."
After 9:30 p. m. on Friday, March 13, 1987 until Saturday, March 14, 1987 there was not an RN or LPN on duty, or any health care person on the premises to administer to an ill respite residential client. The second shift nurse had responsibility to either mandate someone to stay, stay herself, call a physician, or call the Head Nurse. According to Esther MacKintosh, a well qualified Regional Director of Health Services in 1987, CT Page 1425 experienced in both clinical and administration health service, assigned to Regional Center "at that time there were vacancies in the nursing staff in March of 1987." She stated that "if the direct care staff could not take temperatures, for whatever the reason, the nurse would be called in to do that. A nurse would automatically have taken a rectal temperature. The method of choice for a person with a temperature of 100 or over would have been rectally. An option would have been "Temp Away" i.e. a paper device that you put on the forehead and it will tell if the temperature is elevated or not elevated. This was a recognized practice in March of 1987. Shaun's temperature was taken once." Ms. MacKintosh unequivocally stated that a nurse was not authorized to order prescriptions. She stated that the New Haven Regional Center is not a hospital or medical facility. It was her opinion that "Shaun did not receive good, adequate and proper care while a respite client."
Mary Groesbeck, R.N., Bachelor of Science in Nursing, Master of Science in Nursing, and Doctor of Nursing Science (1990) testified on behalf of plaintiff. She has been certified as a clinical specialist by the American Nurses Association. She had reference, training and education in caring for the mentally retarded or mentally handicapped. She was given a composite of the chart of Shaun i.e. what happened with his care at the respite home and when he went to the hospital for the emergency and died, and a copy of the autopsy. She also had depositions of Dr. Meyers and Dr. Lattanzi and depositions of three nurses, McLean, Mackintosh and Flynn. It was her opinion that "the care rendered by the staff at the New Haven Regional Center was not consistent with the applicable standard for health care procedure under similar circumstances back in 1987." Her basic opinion was that Shaun needed to be seen by a physician before the 13th of March. "It's in the respite plan that the nurse go back and see the patient at any point that he is acting out for more than a half hour." Dr. Groesbech read the nurse's notes of his behavior and self-abuse to the point of bruising himself and even bleeding and "wondered why a doctor didn't see him to see what was wrong." "His behavior and conduct on the 10th, 11th or 12th "seemed like he was trying to reach out, but his communications were not directly understood, but the extreme behavior, even if the nurses couldn't figure out what he was saying, it was certainly a cry for help. " "And as I read the notes," that's what I see over and over again." "They should have called the doctor at several points and not only called, but insisted that the doctor either come to see him or take him to the doctor because of the extreme CT Page 1426 acting and behavior." "I question . . . not having any clothes on, if he didn't have a fever." "dried blood in the mouth . . . could come from any kind of internal bleeding most probably stomach or lungs, but that would be something that you would want a physician to examine . . . to find out where the blood came from." "Bruising and bleeding and scratches . . . lying in bed after being very active and acting out, he first lies in bed for three different shifts at least . . . the fluid and eating were varied. He wasn't taking breakfast and on two shifts there was no entry . . . asked about it . . . if it wasn't written, he didn't eat . . . it wasn't written . . . with them he ate . . . controversial . . . not taking fluids well . . . this . . . was in their nursing management plan" . . . "they didn't call the physician" . . . "indications in the chart that this fluid intake did decrease" "the treatment plan . . . notify M.D. if fluid intake decreases" . . . "If a patient has a fluid and salt imbalance . . . a fever is going to be much serious than it would be in someone without a fluid/salt imbalance." "Last summer he was hospitalized for fluid and electrolyte imbalance and pneumonia" "emergency contact person . . . the aunt". "General health . . . good . . . he was healthy when he came in, so if there's a deviation from that behavior, its an aunt, brother so it is even more likely should be brought to the attention or the physician" . . . "he needed to be seen by a doctor a few days before this 13th . . ." "nurses have to key into the behavior, signs and symptoms of retarded patients unable to communicate carefully and . . . have the physician see "(the patient) . . . "they should watch the behavior much more carefully" . . . "the plan and the way they've got the information sheet is all up to standard . . . they really didn't follow what was in the plan" . . . "a nurse is a nurse . . ." "he literally had to be carried out for a fire drill . . . fever 102.5 . . . thought he was very sick . . . don't think doctor given entire picture . . . become more and more acute . . . should have been taken to the doctor." . . . "If there was not a car, that is totally not acceptable" . . . "the admission information sheet indicated a behavior problem plan for assessing and deciding if more medical care is needed for not taking enough fluids . . . respiration at 36 is quite rapid breathing . . . history of pneumonia and fluid electrolyte imbalance, pulse well over a hundred . . . I think there were some indication that he was in respiratory distress as early as the morning of Friday, the 13th" . . . "the standards of the residential staff, not being up to standards in the care and treatment of Shaun Canning;" "were you talking about the standards as you knew them in 1987 for staff persons in places such as the New Haven Regional Center?" . . . "Yes" . . . he did not CT Page 1427 receive humane and dignified treatment at all times while a patient . . . as a respite client in March 1987 . . . "he was not treated with a specialized treatment plan suited to his disorder in March, 1987." . . . "Relatin is used for attention deficient disorder.
"Benadryl is used to calm a patient sometimes, and it is used with children who are on Relatin when their behavior acts up and it works . . . acting out and self-abuse by Shaun was not something new" . . . "nursing had to make a decision if it reached a certain level . . . the Doctor was aware of his behavior but did not examine him . . . his aggression was not behavioral or being homesick" . . . "not drinking fluids well . . . fever . . . losing weight not eating sometimes" (significant?) . . . "I would expect much more documentation . . . the standard of care of nurses at this facility is that they were expected to recognize if there was a significant change in health and if a physician was needed to see the patient as well."
On Tuesday, March 10, 1987 Nurse McLean was on duty and saw Shaun at California house . . . "he was having a behavioral problem in the morning . . . his past history, his behavioral past history was well documented in his respite file . . . thought his problem was a sign he was missing his parents . . . the respite file is very detailed . . . . she assumed he was eating and drinking normally because no one reported otherwise . . . that was the standard procedure of the Regional Center back in 1987." . . . "on Friday, March 13, 1987 she reread the respite plans based on the report received on coming in", that "Shaun had spiked a temp that day . . . started on antibiotics . . . amoxicillin . . . tylenol . . . 3:00 — 4 p. m. . . . he took fluids with medications . . . took fluids and medications again around 8:00 p. m. coloration . . . pinkish . . . flushed at 9:00 p. m. at final rounds" . . . "attempts to take his temperature failed because he started to become abusive and .strike out" — "her options were to call the doctor and request a four-point restraint or asking a nurse to stay the night" . . . "did not feel that was necessary" — or "could have stayed herself if she felt he was seriously ill" . . . "told mental health worker to push fluids on him" . . . "offer him something every one or two hours." She knew "he had a history of fluid imbalance and wanted to he sure he had fluids during the night . . . the nursing staff had to monitor his behavior if he's self-abusive" . . . "Gene Root's notes on March 13, 1987 noted that Shaun was not taking fluids well . . . . Temp-aways were not available to take Shaun's temperature on March 13, 1987 . . . the nursing staff does not CT Page 1428 force temperatures or anything on a client . . . two attempts were made to take his temperature rectally . . . . Gene Root was head nurse and his notes on March 13, 1987 indicated he was aware of Shaun's history . . . under the treatment plan the staff was to notify M.D. if fluid intake decreases . . . no note or instructions were made by the head nurse to give special care and attention to Shaun on March 13 . . . at 9 p. m. on March 13, 1987 his face was flushed, he did not feel like he had a temperature, no signs of respiratory distress, or anything that caused her to believe that a nurse should be there until the night shift comes in." . . . "he had had a temperature and was not taking fluids well on March 13, . . . left instructions to continue to push fluids and try to get a temp from him . . . did not talk to people who came in for the night shift . . . he was not on I and O, which is an intake and output . . . he was a healthy person. I did not think he was ill thought his self-abuse increase in behavior was due to his change in routine . . . clients at the Regional Center decrease the same quality of care as patients in the hospital."
Dr. Alan Meyers Board Certified in Pediatrics with excellent credentials including past and present faculty appointments at, the Assistant Professor level at Yale was called as a witness by the defendant. He has treated patients suffering from hypernatremia during his training and while on the faculty at Yale. Also he thinks, one or two in private practice who had hypernatremia dehydration. He never examined Shaun, treated Shaun or prescribed medication for Shaun in 1987. He reviewed Shaun's medical records, the nursing notes, the behavior notes, the autopsy, Dr. Bill Lattanzi's deposition, his own deposition and a brief emergency note from the Hospital of St. Raphael's. He also reviews the respite plan and the notes of the staff at the New Haven Regional Center.
He testified that he was familiar with the standard of care for treatment of respite clients at the New Haven Regional Center in 1987. He defined "that standard of care was to provide the kind of service that a trained nurse and an ancillary staff would provide to a client who is there on a very temporary basis, akin to that which a trusted friend or a neighbor would provide with the assistance of home health agencies providing the medical care". His testimony concerning Shaun's weight loss mentioned" a lot of confusion . . . 170s to 180 and an estimate of a weight at autopsy of 140 in a period of a week . . . clinically hard to believe a disastrous amount of weight . . . 20% weight loss would lead to shock instantaneously . . . it's very difficult to believe CT Page 1429 but anything is possible" . . . the autopsy pathologist does not describe Shaun as emancipated dehydrated person . . . "two significant pieces of data from the autopsy (1) right or a lobe pneumonia about three centimeters in size, (2) his larynx and trachea contained a thick tenacious (unintelligible) in the area that is critical for respiration . . . . could have contributed to his death from pneumonia . . . one-third of an ounce of urine in his bladder . . . fluid in his stomach . . . no evidence of brain swelling which could possibly be an indication of hypernatremia" . . . he had no opinion whether or not Shaun suffered from hypernatremia . . . he did not have an opinion as to whether Shaun was dehydrated . . . this facility was not a hospital or medical care facility in his opinion temp-away were not available to the medical staff at the New Haven Regional Center in March of "87 (Note — it was not a "medical care facility" but had a medical staff — p. 18 of his testimony on 10/28/92) . . . he testified that "his opinion in that the care that all of the nurses provided was adequate in the macro sense . . . can find micro instances that were less than adequate . . . . "Shaun should have been brought to his primary care physician's office . . . the nursing staff and the care plan called for pushing fluids and when that was not done, that was clearly wrong . . . prescribing Amoxicillin without a proper doctor's order is clearly a deviation . . . didn't know whether there was or was not an electrolyte imbalance . . . Dr. Lattanzi's opinion was speculative based on Shaun's history . . . thought that Gene Root, Debbie Flynn and Sharon McLean were all very competent nurses." . . . "the three nurses did not practice within the standards of care that existed in March 1987 within the macro sense . . . one or more departed from the standards this existed at that time . . . Mr. Root departed from the care the most significantly in the failure to provide transportation when it was needed to bring Shaun to his physician . . . the failure to take Shaun's temperature on the night of his death was also an error in the micro sense — he never saw Shaun or prescribed medication for Shaun — he was not aware of Debbie Flynn's departure from the standard of care . . . within the last twenty-four hours of Shaun Canning's life he was significantly ill . . . in a micro sense there were departure from the standards of care of persons at the facility . . . correct — defendant's supplemental disclosure stated that the care Shaun reviewed at the Regional Center was appropriate and in keeping with the applicable standard of care . . . he conceded that there are departures from the accuracy of the disclosure and his testimony . . . amoxicillin prescribed by Dr. LaCamera's service and that it was prescribed by Dr. Meyers — not true — that is a violation of the standard of care . . . his CT Page 1430 review of Shaun's records was limited to the nursing care provided . . . the dosage of amoxicillin was inaccurate and the notation that Dr. Meyers ordered it was untrue . . . falsify a patient's record, certainly with both the macro and micro sense departs substantially from the standard of care that existed in March 1987 . . . in both senses . . . his prior testimony was that Shaun's temperature was taken 4 or 5 times on the week before he died. Corrected to be taken once but recorded in four different places . . . it would make no difference in his prior opinion if Shaun's temperature was taken one time or four or five times — in the macro sense, no . . . it was not important . . . ."
Dr. Meyers was the contact doctor for the Regional Center in 1987. He did not remember his own involvement in an investigation of the care rendered to Shaun. As a contract physician he was not involved with respite clients. He never knew or saw Shaun. His standard of care akin to that which a treated friend or neighbor would provide with the assistance of home health agencies providing the medical care is to some degree in conflict with the testimony of the other expert witnesses. He failed to be clear and definite in his testimony. His use of "macro" and "micro" lacked the necessary precision for distinguishing the significant from the more or less significant facts enumerated herein. He did not believe a nurse is capable of fine diagnostic abilities but that "they're capable of gross, of listing and finding gross abnormalities." He did not however remember or know if any of three nurses listened to Shaun's chest and lungs within days before he died. He did testify that for the last twenty-four hours of Shaun's life he was significantly ill."
On Friday before his death a nurse was informed that Shaun had a temperature of 102.5. She discussed it with her supervisor Gene Root R.N. They reviewed Shaun's respite client plan, admission form, and referred back to see what should be done. She gave him tylenol and juice. She listened to his chest and lungs. She called Dr. Wessel, reported the fever, his appearance i.e. what she saw. Dr. Wessel asked her if Shaun could be brought in. She asked her supervisor who said no. There was no car. The nurse was new to the Regional Center and not familiar with its routine. Her activities, care and treatment of Shaun were made after her conversation with Gene Root. This team failure to secure a care and/or insist that Shaun be seen by a physician departed substantially from the standard of nursing care that existed in March of 1987 according CT Page 1431 to the testimony of Dr. Meyers.
The burden was upon plaintiff to prove the allegations of paragraph 13 of his complaint. These claims are recorded above. The foregoing recitation of fact and testimony from the identified witnesses, although lengthy, supports a substantial pyramid of significant facts to support this court's conclusion that defendant's negligence resulted in a departure from the accepted standard of care in like conditions.
Paragraph 13b.
The staff failed to adequately provide for the proper health care of Shaun Canning mandated under 19a-469 i.e. "prompt, sufficient and appropriate medical and dental treatment" in that (the staff) failed to transport him to a doctor, as requested, when he was known to be ill on the eve of his death.
Paragraph 13c.
The staff failed to request or insist that his primary care physician or an alternate be summoned to attend and treat him for his historic and apparent illness despite the litary of latent and patient symptoms of his worsening health.
Paragraph 13d.
The staff failed to provide "fluid watches" i.e "in and out" of fluids or weight watches despite the information on his admission sheet and his respite client plan for care and treatment.
Paragraph 13e.
The residential staff at California House failed to test, examine or attend to Shaun despite the expressed concern of the work staff at the Regional Center who were told to "mind their own business."
Paragraph 1f.
The evidence supports a finding that prescription medication was given to Shaun without: a medical order which was a departure from the accepted standard of care in like conditions. There is no evidence that this prescription caused or affected his sudden CT Page 1432 and untimely death but it is a serious significant indication of the team's nonchalant care and treatment and Shaun's ultimate sudden and untimely death.
Paragraph 13g.
The staff failed to intervene in Shaun's behavior and obtain his temperature via a medical order to use restraints, "temp-aways" and/or arm pit or rectal temperatures.
Paragraph 13 h., i. and j.
The staff failed to exercise available option adequate to care and attend to Shaun on the third shift, Friday night and Saturday morning before he expired. His illness, now serious, was not properly monitored even though his history, records, chart and respite plan contained adequate information that "a doctor or hospital care was necessary."
Nothing in the testimony or depositions of seventeen witnesses or forty exhibits seriously controvert these findings or conclusions.
There can be no question that either theory as to the medical cause of Shaun's death i.e. pneumonia or dehydration hypernatremia were easily treatable and curable. Shaun had a life expectancy same as a normal male.
The statutes mandates the duty and obligation of the defendant. There was a breach of that duty as stated above. That breach of duty was a proximate cause of Shaun's death.
The evidence of record adequately describes the requisite standard of care for respite clients and opinions of qualified and credible experts that Shaun was not cared for and treated in accordance with the statutory mandate of prompt, sufficient and appropriate medical treatment and that he did not receive humane and dignified treatment adequate for his needs.
This pyramid of significant facts of team negligence and team failure not adequate to conform to the statutory mandates of care and treatment for respite clients warrants that the court find for the plaintiff on those issues.
Plaintiff advances four predicates on which to assess CT Page 1433 damages (1) pain and suffering (2) loss of life, (3) loss of life's enjoyment, and funeral expenses.
Section 52-555 provides in part — "Actions for injuries resulting in death." In any action serving to or brought by an . . . administrator for injuries resulting in death, whether instantaneous or otherwise, such . . . administrator may recover from the party legally at fault or such injuries just damages together with . . . funeral expenses."
1.
Pain and Suffering
Facts proven and reasonably inferred from the evidence support the conclusion that Shaun suffered physically and mentally during the last five days of his life. Katsetos v. Nolan, 170 Conn. 637, 656 (1976). This evidence is both testimonial i.e. the observations of the staff and nurses who saw and treated him and the physical exhibits. His behavior and conduct recorded above clearly and convincingly supports a conclusion that he was physically sick and mentally frustrated because of lack of care and treatment by the defendant's staff.
2.
Loss of Life
Our rule or assessing damages in death cases gives no precise mathematical formula to apply. The assessment of damages in wrongful death actions "must of necessity represent a crude monetary forecast of how the decedent's life would have evolved." Katsetos above p. 657.
 "Comparison of verdicts is of little value. No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others."
3.
Loss of Life's Enjoyment
The evidence is clear and convincing that the deceased was CT Page 1434 twenty-two years of age at the time of his sudden and untimely death and had a life expectancy of 50.9 years. He enjoyed an active, happy life. He attended special education and training during adolescence. He continued the "work shop" training sessions 5 days a week, all day, at the New Haven Regional Center. His parents, brother, aunt, cousins and extended family in Ireland and England provided him with extensive love and bonding. He enjoyed his own room, clothes, TV (especially wrestling) trips to stores, shopping, McDonalds, picnics, visits, working, receiving his pay and social activities. He was described as a happy person who loved to hug and be hugged. He smiled at seeing friends and others. He laughed a good deal and enjoyed his existence and returned the love he received. He travelled to see relatives in Ireland and England. His health was generally good and his life expectancy was equal to that of the average male.
Since his pay at the Regional Center "work shop" was minimal there is no need to take into account the issues of inflation and present and or future value of the dollar. His self-satisfaction and the joy that was expressed when he reviewed his pay certainly enhanced his pleasure while engaged in the activities of the life that was terminated. His primary care doctor testified that he could expect to enjoy a good quality of life in spite of his handicap.
Judgment may enter for the plaintiff to recover from the defendant for past non-economic damages the sum of $250,000.00 based on the destruction of the capacity to carry on life's activities, plus the sum of $250,000.00 for past non-economic damages based on pain and suffering — total of $500,000.00 past non-economic damages, plus $3,734.00 economic damages for funeral expenses, plus costs.
John N. Reynolds, State Trial Referee